MARTIN, Attorney General, Appellant, vs. SMITH, State Treasurer, Respondent.

*November 6—December 2, 1941.*

316

For the appellant there were briefs by the *Attorney General* and *James Ward Rector,* deputy attorney general, and oral argument by *Mr. Rector.*

R. *M. Rieser* of Madison, for the respondent.

ROSENBERRY, C. J. Disposition of this controversy depends upon whether Clarence A. Dykstra as president of the University of Wisconsin holds an "office of trust, profit or honor in this state," contrary to the provisions of sec. 3, art. XIII of the Wisconsin constitution, which is as follows:

*"Eligibility to office.* Section 3. No member of congress, nor any person holding any office of profit or trust under the United States (postmasters excepted) or under any foreign power; no person convicted of any infamous crime in any court within the United States; and no person being a defaulter to the United States or to this state, or to any county or town therein, or to any state or territory within the United States, *shall be eligible to any office of trust, profit or honor in this state."*

The information and the return are not subject to criticism because of their length, but we do not find it necessary to state all of the matters alleged therein and shall state only so much thereof as is necessary to the determination of whether Clarence A. Dykstra as president of the University of Wisconsin holds an "office of trust, profit or honor" under the constitution and laws of this state.

It appears that on the 9th day of October, 1940, Clarence A. Dykstra was the only appointed and acting president of the University of Wisconsin and had been such for some time prior thereto; that on that day he was notified by the President of the United States that he had been appointed to the office of administrator of the Selective Service Act, an office of profit and trust under the United States. His appointment was confirmed on October 15, 1940, by the senate of the United States, and on October 17, 1940, he qualified for said

office and entered upon the discharge of his duties as such officer; that on the 26th day of October, 1940, the Board of Regents met and adopted a resolution permitting President Dykstra to accept the invitation of the President of the United States to become director of selective service for such temporary period of time as may become necessary in the existing national emergency, it being understood that President Dykstra will continue to be in executive charge of the affairs of the university as president of the university, and that any salary paid to him by the federal government, less expenses, will be refunded to the university. The resolution further provided for a committee with administrative authority to act under the direction of the president during the interim.

In accordance with the understanding had with the Board of Regents at the time of his appointment, President Dykstra has continued to act as president of the university, visiting Madison upon several occasions in the discharge of his duties, all in accordance with the understanding had with the Board of Regents; that no other person has claimed to be president of the University of Wisconsin nor has any other person received the salary of the president during the period in question; that the name of Clarence A. Dykstra was certified to the proper officials of the University of Wisconsin for the month of October, 1940, and his salary as president was duly paid; that his name was again certified on the November pay roll, the pay roll was audited by the secretary of state and two warrants were drawn upon the state treasurer for payment of the salary due for the month of November, 1940, one warrant for $62.50, payable to the treasurer of the teachers' insurance and retirement fund, was paid by the state treasurer. The other warrant, dated December 5, 1940, was recalled by the secretary of state and held by him until March 19, 1941, when the warrant was again sent to the state treasurer for

payment. Pay rolls of the University of Wisconsin for the months of December, 1940, and January and February, 1941, in accordance with the usual custom, carried the name of Clarence A. Dykstra as president of the University of Wisconsin, but the secretary of state refused to allow the amount certified to be due the said Clarence A. Dykstra in either of the said pay rolls until March 19, 1941, when amounts certified as due were allowed and the several warrants drawn, payable to Clarence A. Dykstra in accordance with the pay rolls and certified. It is further alleged:

"The said defendant, John M. Smith, as treasurer of the state of Wisconsin, notwithstanding that the said warrants were presented to him for payment on March 19, 1941, refused and still refuses to honor them or either of them notwithstanding the fact that ample funds are appropriated and monies are in the state treasury sufficient in amount for the purpose of paying the same. The said John M. Smith does not base his refusal to honor the warrants upon the form thereof or upon any claim that monies sufficient for that purpose are not held by him as state treasurer. His refusal to pay is based upon the claim that as president of the University of Wisconsin the said Clarence A. Dykstra was an officer of the state of Wisconsin; that by acceptance of the office of administrator of the Selective Service Act, the said Clarence A. Dykstra vacated his office as president of the University of Wisconsin by reason of the provisions of article XIII, section 3, of the Wisconsin constitution, and that, consequently the said Clarence A. Dykstra is not entitled to payment of the salary attached to the position of president of the University of Wisconsin for the period in question."

By the return, the respondent made certain admissions and denials, among other things, denying that Clarence A. Dykstra has been president of the University of Wisconsin since October 17, 1940. He admits that Clarence A. Dykstra performed some of the functions of president, and alleges that

out of a total of one hundred seven days that elapsed since October 17, 1940, and prior to February 1, 1941, Clarence A. Dykstra spent one hundred six days in Washington, D. C.; that during that time the functions of the office of the president of the university were performed by the committee set up by the Board of Regents; and as a further reason for his refusal to honor the warrants in question, the respondent alleges:

"1. That said Clarence A. Dykstra has been the duly elected president of the University of Wisconsin, an instrumentality of the state of Wisconsin, created pursuant to and by direction of the constitution of the state of Wisconsin, and as such was up to the 17th day of October, 1940, the duly qualified president of the University of Wisconsin; that the duties and responsibilities of said office of president of the University of Wisconsin are set forth in section 36.12 of the statutes and in addition said president of the University of Wisconsin is required by the by-laws of the Board of Regents (section 3, chapter 4 thereof) to perform and carry out the following additional and further official duties:

"'Section 3. The president of the university shall be the executive head of the institution and shall hold his position at the pleasure of the Board of Regents. He shall generally manage and direct the university, carry out the policies and duties as set forth by the Board of Regents, and as president of the university by authority of the Board of Regents and subject to its approval shall make and enforce such rules and regulations as may be necessary or incident thereto and shall make appointments or accept resignations of personnel with rank less than that of associate professor and shall recommend to the Board of Regents the appointment of personnel with a rank equal to or greater than associate professor. The president of the university shall at each meeting of the Board of Regents present a report on actions taken by the administration of the university including appointments, resignations and regulations since the last meeting of the Board of Regents.'

"2. That the University of Wisconsin is what is commonly known as a land-grant college, and as such receives as part of its income, large sums of money from the federal government,

and as such is subject to the provisions of what is commonly known as the Morrill Act of the government of the United States concerning the establishment and conduct of military training at land-grant colleges. Moreover, the University of Wisconsin has likewise elected to take advantage of and come under the provisions of the National Defense Act and particularly sections 40–47C of such act, referring to the reserve officers training corps, and is now subject to all of the rules and regulations prescribed by the war department of the United States for the government thereof, by reason of such acceptance, and conducts both the regular and the advance courses of instruction in a department of the university, for which credit is given toward a degree, generally known and referred to as the military science department of which the president of the University of Wisconsin is the administrative and executive head pursuant to statute and the by-laws referred to above. That as defendant is informed and believes, the execution of the duties and functions of the office require frequent and continual administration of the military science department and the determination and recommendation of policies with respect to relations with the federal government concerning administration of said department.

"3. That as president of the University of Wisconsin such president is also required to exercise vast and important functions with reference to the policy and attitude of the University of Wisconsin toward selective service and the treatment of draftees under such service while members of the staff of the University of Wisconsin as well as those in attendance as students of such university, and particularly students in the advance course of training in the reserve officers training corps. Moreover, in the placement and replacement of employees of the University of Wisconsin, before, during and after service under the requirements of the Selective Service Act, the president of the university, pursuant to his statutory and by-law powers and duties is required to exercise broad and extensive powers and responsibilities and may from time to time be called upon to make important decisions and recommendations as to policy which are vital and important to the university.

"4. On the other hand, as director of selective service, a full-time office of the United States, by reason of the Selective Service Law and the regulations thereunder as prescribed

by the President of the United States, or as authorized to be prescribed by such director, the director of selective service is required to and must exercise similar duties and responsibilities as a federal officer and the functions and duties of the two offices by reason of these responsibilities come in direct conflict with each other.

"5. For all of these reasons the defendant alleges that not only are the offices of president of the University of Wisconsin and director of selective service incompatible under the provisions of our constitution, section 3, article 13, but the duties, functions and responsibilities of said office are actually incompatible and in conflict with each other and that by reason thereof, said Clarence A. Dykstra, by the acceptance of the federal office of director of selective service, has vacated his office of president of the University of Wisconsin and that to make payment of his salary for the period aforesaid is to violate and condone the violation of the public policy as declared by the constitution and by the decisions of our court."

When the matter came on for hearing it was stipulated that the total salary received from the United States by Clarence A. Dykstra from October 15, 1940, to February 1, 1941, was $2,944.40; that the total expenses incurred in discharge of his duties under the Selective Service Act was $1,284.40, the amount to be refunded being the difference or $1,660. It was agreed that the matter should stand and be considered by the court upon motion to quash as if Clarence A. Dykstra had made a tender of the net difference to be refunded to the University of Wisconsin pursuant to the resolution of the Board of Regents and that such tender and refund had been refused by the defendant so that the entire controversy might be disposed of upon the hearing. It was so considered by the trial court and it will be so considered by this court.

## I.

In his brief the respondent "directs the court's attention" to the fact that in the petition it is not alleged that the attorney general is authorized by request of the governor to bring and

maintain this action. The respondent further argues that under sec. 14.53, Stats., which is as follows:

"14.53   *Duties of attorney general.*   The attorney general shall: (1) *Represent state.* . . . when requested by the governor or either branch of the legislature, appear for the state and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people thereof may be in any wise interested."

the petition is fatally defective, citing in support thereof, among other cases, *State v. Snyder* (1920), 172 Wis. 415, 179 N. W. 579. In that case, within the time limited by law, the attorney general brought an action in the name of the state against Snyder and the industrial commission to review an award. There was a motion to dismiss on the ground that the commencement of the action had not been authorized by the governor. Thereupon the governor wrote the attorney general a letter in which he assumed to ratify and confirm on behalf of the state the action of the attorney general. This letter was written and received after the time within which an action to review might be begun. The motion was denied. The trial court affirmed the award and the state appealed. This court after pointing out that by statute it was the duty of the attorney general in any action for the review of an order or award to appear on behalf of the commission, held that in the absence of express authority from the governor under what is now sec. 14.53, Stats., the attorney general had no authority to commence the action, reversed the judgment of the trial court, with directions to dismiss the action. In that case as a matter of statute law it appeared that the attorney general was without authority to commence the action to review. His want of authority was seasonably challenged by a motion to dismiss. The facts in that case are exceptional. For that reason it is considered that it should be confined to its facts.

In this case the action was begun by the attorney general in his own name on behalf of the state. It did not appear from the petition or the return that the attorney general had authority to bring and maintain the action. When the motion to quash came on for a hearing, the respondent directed the court's attention to this omission but did not challenge it by a plea in abatement, motion to dismiss, or otherwise, and the matter was not argued in the court below and therefore not relied upon. In this court the respondent does not now directly challenge the authority of the attorney general but raises the question apparently hoping that the court will take over and decide the matter to which its attention is directed, respondent offering at the same time to consent to the amendment of the petition *nunc pro tunc* by an allegation showing that the attorney general was authorized to commence the action. If the question had been raised we should be obliged to consider whether the attorney general may properly bring this action in his own name for the use of the state. However, although he appears as party plaintiff he alleges that he brings it as attorney general on behalf of the state. The effect is the same as if he had begun an action in the name of the state on relation of the attorney general. As no money judgment in favor of the state is sought, the judgment would be the same in each case. That the state has an interest such as would entitle it to maintain an action to compel its officers to perform their official duties, we have no doubt. For these reasons we pass the question whether the action is properly entitled.

The question sought to be raised is whether the court has jurisdiction of the action by reason of the fact that it is not alleged in the petition that the attorney general was duly authorized to commence the action. It is difficult to classify respondent's contentions. If it was intended to say that the action was not begun and is not being prosecuted by the real party in interest, that is a matter that is waived if not taken

advantage of by demurrer or answer. *Robbins v. Deverill* (1865), 20 Wis. \*142; *National Distilling Co. v. Cream City Importing Co.* (1893) 86 Wis. 352, 56 N. W. 864; Pomeroy's Code Remedies, p. 947, § 587.

If it is contended that it does not appear that the attorney general was authorized to begin and prosecute the action, and for that reason the court is without jurisdiction, that is a question not raised except by answer or plea in abatement where the facts do not appear in the petition. *Union F. H. S. Dist. v. Union F. H. S. Dist.* (1934) 216 Wis. 102, 256 N. W. 788. In the case of *State v. Snyder, supra,* it clearly appeared from the petition that the attorney general was without authority to commence the action. The statute required him to defend the industrial commission. No such fact appears in this case. There is a presumption in the absence of any showing to the contrary that official acts are performed in an honest, efficient, and regular manner. *State ex rel. Willis v. Prince* (1878), 45 Wis. 610; *Forest County v. Shaw* (1912), 150 Wis. 294, 136 N. W. 642; *Gould v. Killen* (1913), 152 Wis. 197, 139 N. W. 758; 1 Jones, Evidence (2d ed.), p. 221, § 139, and cases cited.

It appears from the petition in this case that plaintiff is acting in an official capacity for and on behalf of the state of Wisconsin. There being no allegation to the contrary, the presumption applies and his authority is established *prima facie*. We are not dealing here with a matter of substantive law but with a matter of pleading. We do not hold that the attorney general can proceed without being duly authorized so to do. We merely hold that that question is not presented by the record in this case. That question not having been raised in one of the ways prescribed by statute it is not before us for decision.

Merely directing our attention to a certain question does not challenge the sufficiency of a pleading. The statute provides how that shall be done (ch. 263). If the objection

sought to be raised at this time had been seasonably raised in the trial court, the petition might have been amended if the facts warranted it or the action might have been dismissed and another one begun upon the request of the governor. This action is now before this court on appeal. The matter was not pressed in the trial court and for that reason the trial court did not pass upon it. There can be no question but that the trial court has jurisdiction to entertain the action. The only question involved is whether that jurisdiction was properly invoked. The question sought to be raised should have been raised in accordance with the well-established rule of pleading. If not so raised, it is waived.

## II.

It will be helpful to consider briefly the purpose of sec. 3 of, art. XIII of the Wisconsin constitution. It does not deal with incompatibility of offices, no doubt for the reason that at common law where the nature and duties of two offices were such as to render it improper from considerations of public policy for one person to discharge the duties of both, a person could hold but one; that if one holding a public office accepts another incompatible with the one which he holds, he thereby vacates the first office. *State ex rel. Nebraska Rep. State C. Com. v. Wait* (1912), 92 Neb. 313, 138 N. W. 159, 43 L. R. A. (N. S.) 282, 291, and cases cited. Sec. 13, art. XIV, of the constitution continues the common law in force in the territory of Wisconsin at the time of its adoption so far as it is not inconsistent with the provisions of the constitution. Sec. 3 dealt with eligibility to office, not with incompatibility of offices.

The apparent purpose was to prevent persons holding federal offices from holding at the same time any office of trust, profit, or honor under the laws of this state. This was no doubt intended to protect the state in the exercise of its sovereign power. The history of this section is not easily traced.

We can only speculate as to the reasons which led to its adoption here.

It is admitted by the pleadings that the office of administrator of the Selective Service Act is an office of profit and trust under the United States.

In his brief the respondent directs attention to the fact that prior to 1939 the president of the University was *ex officio* a member of the Board of Regents. (Sec. 36.02, Stats. 1937.) While this is referred to as an indication that the legislature considered the presidency of the university to be an office, we think it should be pointed out that one holding a position *ex officio* is not by reason of that fact an officer. Where the holder of a position has imposed upon him an *ex officio* post or position, the *ex officio* post is not an office within the meaning of that term as used by constitutional and statutory provisions against holding two offices. *In re Appointment of Revisor* (1910), 141 Wis. 592, 124 N. W. 670, L. R. A. 1917 A, annotation, "Offices within constitutional or statutory provisions against holding two offices," p. 231, and cases cited. Additional duties are annexed to the position he already holds. For that reason the fact that the president is or has been by virtue of his position a member of the Board of Regents, does not make him a public officer even though a person appointed as such might be. The use of the term *"ex officio"* is not significant. Officers are of two kinds, public officers and those who are not. Bouvier's Dict., 2 Blackstone, 36. The term "office" is often used without regard to the distinction between public office and public employment.

We come now to a consideration of the question whether the presidency of the university is a public office and the incumbent thereof a public officer. Sec. 36.06, Stats., relates to the duties and powers of the Board of Regents. Subs. (1) and (2) provide:

"(1) The board of regents shall enact laws for the government of the university in all its branches; *elect a president*

*and the requisite number of professors, instructors, officers and employees, and fix the salaries,"* etc.

"(2) The board shall have power to remove the president or any professor, instructor or officer of the university when, in the judgment of the board, the interests of the university require it."

"36.12 *President of the university.* The president of the university shall be president of the several faculties and the executive head of the instructional force in all its departments; as such he shall have authority, subject to the board of regents, to give general direction to the instruction and scientific investigations of the several colleges, and so long as the interests of the institution require it he shall be charged with the duties of one of the professorships. The immediate government of the several colleges shall be intrusted to their respective faculties; but the regents shall have the power to regulate the courses of instruction and prescribe the books or works to be used in the several courses, and also to confer such degrees and grant such diplomas,as are usual in universities or as they shall deem appropriate, and to confer upon the faculty by by-laws the power to suspend or expel students for misconduct or other cause prescribed in such by-laws."

Sec. 3 of ch. 4 of the by-laws adopted by the Board of Regents provides:

"Sec. 3. The president of the university shall be the executive head of the institution and shall hold his position at the pleasure of the Board of Regents. He shall generally manage and direct the university, carry out the policies and duties as set forth by the Board of Regents, and as president of the university by authority of the Board of Regents and subject to its approval shall make and enforce such rules and regulations as may be necessary or incident thereto and shall make appointments or accept resignations of personnel with rank less than that of associate professor and shall recommend to the Board of Regents the appointment of personnel with a rank equal to or greater than associate professor. The president of the university shall at each meeting of the Board of Regents present a report on actions taken by the administration of the university including appointments, resignations

and regulations since the last meeting of the Board of Regents."

It is to be noted that by sec. 36.12, Stats., such authority as the president has is subject in all things to the Board of Regents. The power given the board by sec. 36.06 (1) to "enact laws for the government of the university in all its branches" is very broad, subject to no limitations except such as are implied from the nature of the subject matter to which it applies. It may withdraw at any time any powers which it has conferred upon the president. The president serves only so long as in the judgment of the Board of Regents the interests of the university do not require his removal. There is vested in the board by this clause of the statutes a power of removal that is absolute. It need not be for cause and when the president accepts an election to the presidency, he accepts it subject to the statutory authority of the board.

The power to restrict the activities of the president and to prescribe his duties and to exact compliance with the laws prescribed by the Board of Regents is strongly in contrast with the great influence and power which everyone familiar with the administration of the university knows that the president exercises. Despite these limitations he is in fact the executive and directing head of the institution. The position is one of great power and influence because as a rule it is filled by men highly trained and very able. Their influence derives very largely from the fact that they are men of extraordinary ability and sterling character. When we come, however, to examine the limitations to which they are subject, it is plainly evident that as a matter of statutory authority, the entire policy-making authority of the university is primarily in the Board of Regents. What the president does he does pursuant to its discretion and subject to its approval.

In order to resolve the controversy in this case it is necessary for us to apply to this factual situation the legal defini-

tion and meaning of the term "public office." As long ago as 1843, the supreme court of the territory of Wisconsin had before it the case of *United States ex rel. Boyd v. Lockwood,* 1 Pin. 359, 363. The question for decision was whether the office of judge of probate of Crawford county was a public office. The court said:

"An office is where, for the time being, a portion of the sovereignty, legislative, executive or judicial, attaches, to be exercised for the public benefit."

This court had the matter under consideration in *Sieb v. Racine* (1922), 176 Wis. 617, 624, 187 N. W. 989, where it is said:

"The question whether a given employment constitutes the one selected for its discharge an officer or a mere employee is often a difficult one. The line between the two is frequently shadowy and difficult to trace. In examining sec. 926—115, however, we find an absence of many of the recognized characteristics of an office. There is no definite term; the appointee is not required to take an oath; he exercises none of the functions of sovereignty, unless it be in the matter of licensing teachers. While, possibly, these are not indispensable, they are usual characteristics of an office. Whether the legislature intended to constitute the position an office is at least doubtful. In view of the considerations stated, we are disposed to and do hold that the city superintendent of schools was not an officer."

It is considered that *In re Nagler* (1927), 194 Wis. 437, 439, 216 N. W. 493, is decisive of the question raised in this case. It appears that ch. 426, Laws of 1927, authorized the conservation commission to employ a conservation director who should hold his office at the pleasure of the commission and whose salary not exceeding $6,500 a year should be fixed by the commission, his qualifications were prescribed, he was not to be subject to the civil-service rules, he was to be the administrative head of the state conservation department, responsible to the commission for the execution of its policies,

was authorized to employ, by and with the advice of the commission, assistants such as might be necessary for the execution of such policies, and to exercise the powers of the commission in the interim of its meetings but subordinate thereto. It was contended that the relator was a public officer, and the cases of *Hall v. State* (1875), 39 Wis. 79; *In re Appointment of Revisor, supra,* and *State ex rel. Gubbins v. Anson* (1907), 132 Wis. 461, 112 N. W. 475, were cited in support of that contention. The court said:

"Respondent claims that the application should be denied because he is not a public officer and *quo warranto* does not lie. The contention is well taken for the following reasons: He is *employed* by the commission, not *appointed* or *elected*. [Citing.] No definite term of holding the employment is fixed. His salary may be anything the commission fixes not exceeding $6,500. His powers are in all things subordinate to those of the commission, and he must carry out its policies. He cannot even make rules, but must adopt those of the commission. Public officers must take an oath as prescribed by sec. 28, art. IV, of the constitution unless exempted therefrom. No exemption appears in the act and no requirement to take an oath. He is not required to give a bond. He is not required to be a citizen of the state, as he must be if a public officer. The reasons for holding that he is not a public officer are stronger in this case than in the case of *Sieb v. Racine* [already cited] . . . more technical knowledge and ability is required of the director of conservation than of a superintendent of schools."

While it is true that the statute provides that the Board of Regents shall "elect" a president, the legal effect would be no different if it had said that the Board of Regents shall employ a president because the person elected does not become a president by election but by acceptance of a proposal made to him by the Board of Regents. The Board of Regents by the same section is authorized to "elect" professors, but they are not public officers. *Butler v. Regents of the University* (1873), 32 Wis. 124.

In an extensive note found in 53 A. L. R. 595, "Distinction between office and employment," many cases from all sections of the country are cited, a number of which are analyzed. The note is appended to the case of *State ex rel. Barney v. Hawkins* (1927), 79 Mont. 506, 257 Pac. 411, 53 A. L. R. 583. In the opinion in that case, cases from many jurisdictions are cited and analyzed and it is held that—

"to constitute a position of public employment a public office of a civil nature, it must be created by the constitution or through legislative act; must possess a delegation of a portion of the sovereign power of government to be exercised for the benefit of the public; must have some permanency and continuity, and not be only temporary or occasional; and its powers and duties must be derived from legislative authority and be performed independently and without the control of a superior power, other than the law, except in case of inferior officers specifically placed under the control of a superior officer or body, and be entered upon by taking an oath and giving an official bond, and be held by virtue of a commission or other written authority."

This definition of "public office" is no doubt a summary of the law upon the subject arrived at by an analysis and careful consideration of the authorities. The conclusion reached by the Montana court is in accord with the statements contained in the note which is appended to the case. It is certain that a person employed cannot be a public officer, however chosen, unless there is devolved upon him by law the exercise of some portion of the sovereign power of the state in the exercise of which the public has a concern. The annotator cites *In re Appointment of Revisor* (1910), 141 Wis. 592, 124 N. W. 670, in support of this proposition. The president of the university being subject in all things to the action of the Board of Regents, it is the Board of Regents and not the president that exercises some part of the sovereign power of the state. The president of the university is a subordinate of the Board of Regents in executing and carrying out the

policies and laws laid down by it. In the case of the director of the state conservation commission, he was authorized by legislative act to exercise the powers of the commission when the commission was not in session, a much broader and less restricted power than is conferred upon the president of the university.

It may seem anomalous to some that the president of a great university should not be a public officer while a justice of the peace or a notary public is a public officer. However, the character of the employment is not determined by the salary paid to the employee or by the importance of the duties which he performs or by the manner in which he is chosen, but rather by the nature of the duties he performs. In the case of the president of the university, the nature of these duties much more nearly conforms to the nature of the duties of a superintendent of schools than it does to the nature of the duties performed by a public officer. He is an employee, not a public officer; he holds a position not an office of trust, profit, or honor under the state. It appearing that Mr. Dykstra does not hold an office of trust, profit, or honor in this state, his acceptance of a public office under the United States did not make him ineligible to hold the position of president of the university. He should have been paid his salary upon the warrants issued in accordance with the arrangements made with the Board of Regents.

*By the Court.*—The order appealed from is reversed, and the cause remanded with directions to the trial court to sustain the demurrer to the return and enter judgment in accordance with the prayer of the petition.